UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

OLYMPUS INSURANCE COMPANY,                    Case No. 11-CV-2607 (PJS/AJB)

         Plaintiff,

v.                                            ORDER

AON BENFIELD, INC., and
BENFIELD, INC.,

         Defendants.

Terence J. Devine, DEVINE, MARKOVITS, & SNYDER, LLP; Thomas D. Jensen, LIND, JENSEN, SULLIVAN & PETERSON, for plaintiff.

David Y. Trevor, Timothy E. Branson, DORSEY & WHITNEY LLP, for defendants.

Plaintiff Olympus Insurance Company ("Olympus") has sued defendants AON Benfield, Inc. and Benfield, Inc. (collectively "Benfield") seeking money that Olympus claims is owed under a contract between the parties. On the face of the contract, Olympus does not seem to have a right to the money that it seeks from Benfield, but Olympus makes a series of arguments for why the Court should disregard or give a strained construction to the text of the contract. Olympus's arguments are unavailing, and Benfield's motion to dismiss is granted.

## I. BACKGROUND

Olympus is engaged in the business of selling insurance. Olympus typically reinsures a portion of its portfolio every year. To that end, Olympus appoints a reinsurance broker, who obtains reinsurance policies for Olympus and services those policies on Olympus's behalf.

Olympus appointed Benfield to act as its reinsurance broker for the fiscal year beginning June 1, 2008. In return for the appointment, Benfield promised to do a number of things,

including pay Olympus an "Annual Fee" — essentially a rebate due at the end of the fiscal year. The Annual Fee was to be calculated as a percentage of the commissions that Benfield received during the year from Olympus's reinsurers.

The first numbered paragraph of the parties' contract combines a clause obliging Benfield to pay the Annual Fee with an evergreen clause.  Under the evergreen clause, Benfield is automatically reappointed as Olympus's reinsurance broker each year unless either party notifies the other of its intent not to renew.  The pertinent contractual language is as follows:

> In consideration for [Olympus] appointing Benfield as its exclusive reinsurance intermediary-broker for the placement and servicing of all of [Olympus's] reinsurance contracts (the "Subject Business") for the initial annual period beginning on June 1, 2008 and ending on May 31, 2009 (the "Initial Term") (each June 1 to May 31 may also be referred to as an "Agreement Year"), and for additional subsequent Agreement Years (each such year a "One-Year Renewal Term") unless either party notifies the other party of its intent not to renew this Agreement at least 30 days prior to the end of the Initial Term or any subsequent One-Year Renewal Term, Benfield agrees to share with [Olympus] Benfield's received and earned brokerage revenue derived from the Subject Business excluding any brokerage paid to corresponding brokers, including any brokers affiliated with Benfield or sub-brokers ("Net Brokerage Revenue") by paying [Olympus] an annual fee ("Annual Fee") for each Agreement Year equal to 70% of all Net Brokerage Revenue less the Service Fee set forth in Paragraph 2 of this Agreement.

Compl. Ex. A ¶ 1.

The contract goes on to qualify Benfield's obligation to pay the Annual Fee in an important way:

> No Annual Fee shall be payable subsequent to any decision by [Olympus] to terminate or replace Benfield as its reinsurance intermediary-broker for any portion of the Subject Business.

Compl. Ex. A ¶ 3.  The meaning of this provision — which the Court will refer to as the "forfeiture provision" — is the central issue in this lawsuit.

In early 2009, Peter Chandler, a Benfield broker who handled Olympus's business, left Benfield and went to work for Guy Carpenter & Co., LLC ("Guy Carpenter").  Lowry Aff. ¶ 33. Olympus decided to appoint Guy Carpenter as its reinsurance broker effective June 1, 2009 — the beginning of the next fiscal year — so that it could continue to work with Chandler.  Lowry Aff. ¶ 33.  On February 17, 2009, Olympus sent a broker-of-record letter to Guy Carpenter formally appointing the company as its new reinsurance broker, effective June 1, 2009.  Lowry Aff. ¶ 34; Compl. Ex. C.  On March 25, 2009, Guy Carpenter notified Benfield that Olympus would not be renewing its contract with Benfield.  Lowry Aff. ¶ 35.  There is no dispute that this notice functioned as the notice necessary to prevent automatic renewal of Benfield's appointment under ¶ 1 of the parties' contract.

Olympus had not sought — and Benfield had not paid — the Annual Fee prior to the time that Olympus decided to replace Benfield with Guy Carpenter.  Again, the Annual Fee functioned as a year-end rebate, and it is undisputed that Benfield had no obligation to pay any portion of the Annual Fee prior to March 25, 2009.  What the parties dispute is whether Benfield was *ever* obligated to pay the Annual Fee.  Olympus argues that it is owed the Annual Fee that was due at the end of the 2008-2009 fiscal year.  Benfield responds that it does not owe the Annual Fee because Olympus decided "to terminate or replace Benfield as its reinsurance intermediary-broker" no later than March 25, 2009, and, under the forfeiture provision, "[n]o Annual Fee shall be payable subsequent to [that] decision."  Compl. Ex. A ¶ 3.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  But the plaintiff must do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause of action . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).  But the court may consider exhibits attached to the complaint and documents that are necessarily embraced by the complaint without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).[1]

### B.  Contract Claim

The parties' contract provides, and the parties agree, that the contract is governed by Minnesota law.  Compl. Ex. A ¶ 5.  Under Minnesota law, the construction of an unambiguous contract is a question of law. *Drewitz v. Motorwerks, Inc.*, 728 N.W.2d 231, 237 (Minn. 2007). "When the language is clear and unambiguous, [courts] enforce the agreement of the parties as

---

[1]The circumstances under which Olympus replaced Benfield as its reinsurance broker, although not in dispute, are not fully spelled out in the complaint.  For this reason, the Court has looked to the affidavit of William Lowry (which was submitted by Olympus) for additional details.  Technically speaking, then, Benfield's motion should be treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).  But this conversion has no practical effect.  The Court has treated the facts alleged in the complaint as true and has looked to Olympus's own submission in order to supplement those facts with some minimal undisputed details.

expressed in the language of the contract." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582

(Minn. 2010).  If and only if the language of the contract is ambiguous may parol evidence be

considered to determine the meaning of the contract.  *Id.*  Whether a contract is ambiguous —

that is, whether it is subject to more than one reasonable interpretation — is a question of law.

*Id.*  Ambiguities in a contract must be construed against the drafter, *Turner v. Alpha Phi Sorority*

*House*, 276 N.W.2d 63, 66 (Minn. 1979), but this rule obviously does not apply when the

contract is unambiguous, *Stafne Construction & Aggregate, LLC v. Bambenek*, No. A10-873,

2011 WL 1466368, at *4 (Minn. Ct. App. Apr. 19, 2011).

Benfield denied payment of the Annual Fee based on the forfeiture provision.  Again, the

forfeiture provision provides that "[n]o Annual Fee shall be payable subsequent to any decision

by [Olympus] to terminate or replace Benfield as its reinsurance intermediary-broker for any

portion of the Subject Business."  Compl. Ex. A ¶ 3. Benfield's position is straightforward:

(1) No Annual Fee was due before March 25, 2009.  (2) Olympus made the decision to end its

relationship with Benfield before March 25, 2009.  (3) This was a decision by Olympus "to

terminate or replace Benfield as its reinsurance intermediary-broker."  (4) Under the forfeiture

provision, "[n]o Annual Fee shall be payable subsequent to" such a decision.  (5) In sum, because

the Annual Fee was not payable *before* Olympus's decision, and because the Annual Fee is not

payable *after* Olympus's decision, the Annual Fee is not payable at all.

Benfield's argument seems consistent with the text of the contract.  But Olympus makes a

number of arguments for why Benfield nevertheless must pay the Annual Fee.

To begin with, Olympus points out that the forfeiture provision refers to a decision by

Olympus "to terminate or replace Benfield as its reinsurance intermediary-broker *for any portion*

*of the Subject Business*."  Olympus argues that, even if it did decide to "terminate or replace Benfield as its reinsurance broker," it did not do so "for any portion of the Subject Business." According to Olympus, the "Subject Business" consists only of the placement and servicing of Olympus's reinsurance contracts for the Initial Term — that is, the first fiscal year covered by the agreement (June 1, 2008 to May 31, 2009).  There is no dispute that Benfield was not terminated or replaced as Olympus's reinsurance broker for the reinsurance contracts placed and serviced during the Initial Term.  Thus, says Olympus, the forfeiture provision was not triggered, and it is owed the Annual Fee.

Olympus's argument fails because the manner in which it defines "Subject Business" is inconsistent with the manner in which the contract defines "Subject Business."  The contract explicitly defines the phrase "Subject Business" by capitalizing the "s" in "Subject" and "b" in "Business," by placing the phrase in quotation marks, and by placing the phrase in a parenthetical that appears immediately after the words "the placement and servicing of all of [Olympus's] reinsurance contracts . . . ."  Compl. Ex. A ¶ 1.  The clear meaning of this sentence is that "Subject Business" is defined as the placement and servicing of *all* of Olympus's reinsurance contracts — not just the placement and servicing of reinsurance contracts during the Initial Term. *See Homesite Ins. Agency, Inc. v. Benfield Inc.*, No. 27-CV-10-3938, slip op. at 7 (Minn. Dist. Ct. June 11, 2010) (attached as Ex. 3 to Branson Aff.) (holding that, under standard principles of contract draftsmanship and interpretation, the parenthetical term "Subject Business" in a similar contract was defined by the immediately preceding language).

Olympus contends that the language following the "Subject Business" parenthetical — namely, "the initial annual period beginning on June 1, 2008 and ending on May 31, 2009" —

limits the definition of "Subject Business" to that time period.  The Court disagrees.  *See id.* (noting that "the defined term is defined by tucking it at the *end* of the definition in parentheses" (emphasis added; citation and quotations omitted)).  In the Olympus-Benfield contract — as in every legal document that the Court has ever read — a phrase placed in quotations and parentheses immediately after a series of words is defined by the words that *precede* it, not by the words that *follow* it.

Suppose that a contract began with the following sentence:

> International Business Machines Corporation ("IBM") agrees to retain John Smith ("Smith") to provide an audit of IBM's corporate records ("Auditing Services") for the periods October 1, 2009 to September 30, 2010 ("2009 Fiscal Year") and for the period October 1, 2010 through September 30, 2011 ("2010 Fiscal Year").

No one reading this sentence could doubt that "IBM" is defined as "International Business Machines Corporation," "Smith" as "John Smith," "Auditing Services" as "an audit of IBM's corporate records," "2009 Fiscal Year" as "the period October 1, 2009 to September 30, 2010," and "2010 Fiscal Year" as "the period October 1, 2010 through September 30, 2011."  True, under this contract Smith is being *hired* to provide "Auditing Services" for only the 2009 and 2010 fiscal years.  But that does not mean that the contract *defines* the phrase "Auditing Services" to mean only auditing services provided during those two years.  Such a reading of "Auditing Services" would be inconsistent with the structure of the sentence — and would, in fact, make the latter half of the sentence (beginning with "for the period . . .") redundant.  If the parties meant to limit the definition of "Auditing Services" to an audit of IBM's corporate

records for the 2009 and 2010 fiscal years, then they would have placed the phrase "Auditing Services" in parentheses at the end of the sentence, not in the middle of the sentence.

The first numbered paragraph of the Olympus-Benfield contract is structured similarly:

> In consideration for [Olympus] appointing Benfield as its exclusive reinsurance intermediary-broker for the placement and servicing of all of [Olympus's] reinsurance contracts (the "Subject Business") for the initial annual period beginning on June 1, 2008 and ending on May 31, 2009 (the "Initial Term"), and for additional subsequent Agreement Years (each such year a "One-Year Renewal Term") unless either party notifies the other party of its intent not to renew this Agreement at least 30 days prior to the end of the Initial Term or any subsequent One-Year Renewal Term. . . .

Compl. Ex. A ¶ 1. This sentence clearly defines "Subject Business" as "the placement and servicing of *all* of [Olympus's] reinsurance contracts." "Subject Business" therefore includes, but is not limited to, reinsurance contracts placed during the Initial Term — just as it includes, but is not limited to, reinsurance contracts placed during any One-Year Renewal Term. To read "Subject Business" to refer only to the placement and servicing of reinsurance contracts during the Initial Term would be inconsistent with the structure of the sentence. If the parties meant to limit the definition of "Subject Business" to "the placement and servicing of Olympus's reinsurance contracts for the annual period beginning on June 1, 2008 and ending on May 31, 2009," they could have said just that — or they could have placed the parenthetical containing the phrase "Subject Business" where they placed the parenthetical containing the phrase "Initial Term." They did not.

Read as a whole, then, ¶ 1 of the Olympus-Benfield contract contains a series of embedded definitions in which each defined term follows the language that defines it. Parsing

the language of ¶ 1 demonstrates that Olympus agreed to (1) appoint Benfield as its broker for the Subject Business (2) for an Initial Term and (3) for additional One-Year Renewal Terms, so long as neither party gave notice of its intent not to renew.  Olympus's argument improperly conflates the two separate concepts in (1) and (2) — (1) the Subject Business that is the subject of the parties' agreement and (2) the Initial Term for which Olympus appointed Benfield as its broker.  Because the term "Subject Business" is clearly defined to include the placement and servicing of all of Olympus's reinsurance contracts without limitation, Olympus's argument is without merit.

Olympus next argues that, even if "Subject Business" includes the placement and servicing of reinsurance contracts beyond the Initial Term, the forfeiture provision was not triggered because Olympus did not "terminate" or "replace" Benfield.  Instead, argues Olympus, it merely elected not to renew Benfield, and electing not to renew Benfield is something different from "terminat[ing]" or "replac[ing]" Benfield.  The Court disagrees.

Nothing in the contract defines "terminate" or "replace" or suggests that they are terms of art with distinct meanings that do not overlap with each other or with the concept of non-renewal.  And nothing in the contract suggests that a decision by Olympus to terminate Benfield or to replace Benfield with another broker is different from a decision by Olympus not to renew its relationship with Benfield.  To the contrary, under the contract's evergreen clause, Benfield continues to serve as Olympus's broker unless Olympus takes an affirmative step to end their relationship.  The *only* method for Olympus to end its relationship with Benfield that is mentioned in the contract is for Olympus to notify Benfield "of its intent not to renew."  It would be exceedingly strange for the forfeiture provision — a provision that is triggered by the

termination of the Olympus-Benfield relationship — not to encompass the only means of

termination of the Olympus-Benfield relationship that is mentioned in the contract.

 At oral argument, the Court pressed Olympus to explain what the contract could have

meant by "terminate" and "replace" if those terms did not encompass a decision not to renew.

Olympus responded that "terminate" and "replace" refer to a decision by Olympus to sever its

relationship with Benfield *during* a fiscal year, rather than to a decision by Olympus not to renew

its relationship with Benfield at the *end* of a fiscal year.  Thus, according to Olympus, the

forfeiture provision applies only if Olympus says to Benfield in the middle of the Initial Term or

a One-Year Renewal Term:  "You're fired.  Not only will we not be renewing, but we order you

to stop servicing our reinsurance policies immediately."[2]

 Olympus's interpretation makes no sense in light of the purpose of the contract and the

purpose of the forfeiture provision.  The explicit basis of the contract, as stated in the prefatory

language, is "the desire of the parties to establish a long-term mutually beneficial

relationship . . . ."  Compl. Ex. A.  Obviously, "long-term" means more than one year.  Just as

obviously, the forfeiture provision was inserted into the contract to benefit Benfield by providing

a financial disincentive for Olympus to end their relationship and replace Benfield with a

different broker.  But under Olympus's interpretation of the contract — under which a decision to

"non-renew" is somehow different from a decision to "terminate" or "replace" — no adverse

consequence of any kind would attach to Olympus's decision not to renew.  The *only* thing that

---

 [2]To be precise, because Olympus takes the position that "Subject Business" is limited to the reinsurance placed and serviced during the "Initial Term," Olympus really argues that the forfeiture provision is triggered only if Olympus makes this statement to Benfield in the middle of the *first* year of the contract.

would be discouraged by the forfeiture provision would be a mid-year termination of the relationship.

If that were true, though, then the only thing that the forfeiture provision would discourage is something that *helps* Benfield. Whether Benfield is "fired" in the middle of the year or at the end of the year has no impact on its commissions; either way, it gets to keep all of the commissions that it earned by placing Olympus's reinsurance policies for that year. *See* Hr'g Tr. 10-11, 15, Dec. 21, 2011 [ECF No. 19]. The only impact that a mid-year firing has on Benfield as compared to a year-end firing is that the mid-year firing relieves Benfield of the responsibility to service the reinsurance policies that it has placed. Thus, as between (1) being non-renewed and (2) being non-renewed and being told to immediately stop servicing the reinsurance policies, Benfield would actually prefer the latter. According to Olympus, though, the latter is the one and only means of termination that the forfeiture provision discourages.

In short, Olympus's argument turns the forfeiture provision on its head. The forfeiture provision is clearly intended to benefit Benfield by imposing a financial loss on Olympus if it terminates the parties' relationship. Yet as Olympus interprets it, the forfeiture provision does not in any way discourage Olympus from terminating the parties' relationship; rather, the forfeiture provision merely discourages Olympus, *after* it decides to terminate the parties' relationship, from terminating the relationship in a way that would *benefit* Benfield. Olympus's interpretation is untenable.

The Court concludes that the terms "terminate" and "replace" must be given their plain and ordinary meanings, which are broad enough to encompass the concept of non-renewal. *See Turner*, 276 N.W.2d at 67 (language in a contract is to be given its plain and ordinary meaning).

-11-

That "terminate" and "replace" are intended to include a non-renewal is underscored by what (in the language of the forfeiture provision) is being "terminate[d]" or "replace[d]":  Benfield's position as the broker "for *any portion* of the Subject Business."  As discussed above, "Subject Business" refers broadly to "the placement and servicing of *all* of [Olympus's] reinsurance contracts" without any time limitation.  When Olympus decided to engage a different broker for the year beginning on June 1, 2009, it was manifestly "terminat[ing]" and "replac[ing]" Benfield with respect to a "portion of the Subject Business" — the portion that consists of the year beginning June 1, 2009.  It would require an overly strained reading of the contract to conclude that a "terminat[ion]" or "replace[ment]" of  "*any portion*" of "the placement and servicing of *all* of [Olympus's] reinsurance contracts" does not include a non-renewal for a subsequent year, particularly when non-renewal is the only contractually recognized way to end the parties' relationship.

In sum, the Court holds that the terms "terminate" and "replace" include non-renewal, and that Olympus's decision to terminate its relationship with Benfield — and to replace Benfield with Guy Carpenter — was clearly a "decision by [Olympus] to terminate or replace Benfield as its reinsurance intermediary-broker for any portion of the Subject Business" for purposes of ¶ 3 of the contract.  Under the unambiguous language of the contract, therefore, no Annual Fee is payable.

Olympus strenuously argues that the Court's reading of the contract leads to an absurd result.  But there is nothing absurd about a provider of services agreeing to provide a year-end rebate only on the condition that the purchaser renew the parties' contract for the following year.

It seems, in fact, like a straightforward way to accomplish the explicit purpose of the contract: "to establish a long-term mutually beneficial relationship . . . ."  Compl. Ex. A.

Olympus also contends that, even if the Court agrees with Benfield's interpretation of the contract, the Court must allow the case to proceed because the contract does not contain an integration clause and therefore extrinsic evidence of the parties' intent is admissible.  *See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003) ("where a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible" (citation and quotations omitted)).  The Court notes that the absence of an express integration clause does not necessarily mean that the contract is not integrated.  *See Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1434-35 (8th Cir. 1995) (applying Minnesota law); *Minn. Teamsters Pub. & Law Enforcement Emps. Union v. County of St. Louis*, 726 N.W.2d 843, 848 (Minn. Ct. App. 2007).  More importantly, though, extrinsic evidence is not admissible to contradict the unambiguous language of a contract even if the contract is not integrated.  *Anchor Cas. Co. v. Bird Island Produce, Inc.*, 82 N.W.2d 48, 53 (Minn. 1957) ("Where, as here, the effect of the profferred [sic] evidence would be to contradict the plain meaning of the language of the exhibit, or to engraft upon it a provision entirely outside of it, parol evidence for that purpose is not admissible."); *Samuel H. Chute Co. v. Latta*, 142 N.W. 1048, 1049 (Minn. 1913) ("[w]here the writing, construed in the light of such circumstances, shows that it was not meant to contain the whole bargain between the parties, then parol evidence is admissible to prove a term upon which the writing is silent, and *which is not inconsistent with what is written*" (emphasis added)).

As discussed above, the Court holds that Benfield does not owe Olympus an Annual Fee. Because this result is dictated by the unambiguous language of the written contract, extrinsic evidence of any contrary intent is not admissible to contradict this language, whether or not the contract is integrated.[3]  The Court therefore grants Benfield's motion to dismiss Olympus's claim for breach of contract.

### C.  Remaining Claims

Olympus's remaining claims are quasi contract, unjust enrichment, and quantum meruit. Parties to an express contract, however, cannot recover under any of these equitable theories.  *See Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984) ("Because there was an express contract in this case, the trial court's award of compensation under a quasi-contract or an unjust enrichment theory, which in essence amounted to an award in *quantum meruit*, was contrary to well-established Minnesota case law."); *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998) ("The existence of an express contract between the parties precludes recovery under the theories of quasi-contract, unjust enrichment, or quantum meruit.").[4]

---

[3]In the complaint, Olympus alleges that, both before and after Olympus decided not to renew Benfield, Benfield representatives told Olympus that Benfield would pay the Annual Fee. Compl. ¶ 23.  Olympus does not refer to these alleged statements in its response to Benfield's motion, however.  For example, Olympus does not argue that these alleged statements created a new contract or modified the parties' existing contract.  The Court therefore reads the allegation about these statements in the complaint as nothing more than a reference to extrinsic evidence of the contract's meaning, which, as discussed above, is not admissible to contradict the contract's unambiguous language.

[4]Olympus cites *Frankson v. Design Space International*, 394 N.W.2d 140 (Minn. 1986), *Holman v. CPT Corp.*, 457 N.W.2d 740 (Minn. Ct. App. 1990), and *Auntie Ruth's Furry Friends' Home Away from Home, Ltd. v. GCC Property Management, LLC*, No. A08-1602, 2009
(continued...)

Olympus argues that, if the Court disagrees with Olympus's interpretation of the contract, then there was no meeting of the minds and hence no contract at all.  Olympus is plainly wrong.  In *every* contract dispute, the parties disagree about the meaning of the contract.  And thus in *every* contract dispute, the judge or jury will disagree with one (or both) of the parties' interpretations.  Obviously, that does not mean that the parties did not have a contract.  As the Minnesota courts have made clear on countless occasions, whether a contract exists depends on the parties' objective conduct (on what they say or do) and not on their subjective intentions (on what is in their minds).  *Holt v. Swenson*, 90 N.W.2d 724, 728 (Minn. 1958) ("The requisite mutual assent for the formation of a contract — frequently expressed by the inaccurate and misleading phrase 'meeting of the minds' — does not require a subjective mutual intent to agree on the same thing in the same sense, but may be based on objective manifestations whereby one party by his words or by his conduct, or by both, leads the other party reasonably to assume that he assents to and accepts the terms of the other's offer."); *Speckel by Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985) ("Minnesota follows the objective theory of contract formation, under which an outward manifestation of assent is determinative, rather than a party's subjective intention.").

_____

[4](...continued)
WL 2926485 (Minn. Ct. App. Sept. 15, 2009), for the proposition that equitable relief is available even when the parties have an express contract.  Olympus reads too much into these cases.  In all three of them, the courts acknowledged the general rule that equitable relief is unavailable if the parties' rights are governed by a valid contract, but went on to hold that, if there is *not* a contract concerning the details of compensation, a party may obtain equitable relief.  *Frankson*, 394 N.W.2d at 145; *Holman*, 457 N.W.2d at 745; *Auntie Ruth's Furry Friends' Home Away from Home, Ltd.*, 2009 WL 2926485, at *7.  In contrast to the contracts in those cases, the Olympus-Benfield contract fully spells out the circumstances under which Olympus is entitled to an Annual Fee as well as the manner in which the Annual Fee is calculated.

Finally, Olympus argues that, if the Court adopts Benfield's interpretation of the contract, then there is a complete failure of consideration.[5]  The Court disagrees.  A failure of consideration occurs when a contract that was initially valid "becomes unenforceable because the performance bargained for has not been rendered."  *Franklin v. Carpenter*, 244 N.W.2d 492, 495 (Minn. 1976).  "Where a promisor received what he bargained for, however, there is no failure of consideration."  *In re MJK Clearing, Inc.*, 408 F.3d 512, 515 (8th Cir. 2005) (applying Minnesota law).  Here, Olympus received exactly what it bargained for in the written contract: Benfield's placement and servicing of reinsurance contracts as well as the conditional entitlement to an Annual Fee.  Both of these benefits are legally sufficient consideration.  *Cf. Noreen v. Park Constr. Co.*, 96 N.W.2d 33, 37-38 (Minn. 1959) (promise contingent on third-party approval could be consideration); 3 Richard A. Lord, *Williston on Contracts* § 7.6 at 106 (4th ed. 2008) ("a conditional promise may serve as consideration").  Whether Olympus subjectively believes these benefits to be adequate consideration is irrelevant.  *See Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 919 (Minn. Ct. App. 2008) ("The amount of consideration is irrelevant so long as some benefit or detriment is proved.").  The Court therefore grants Benfield's motion to dismiss Olympus's equitable claims.

---

[5]Olympus uses both the phrases "failure of consideration" and "lack of consideration." These are distinct concepts.  A lack of consideration means that no contract was ever formed; a failure of consideration, by contrast, means that an initially valid contract has become unenforceable.  *See Cameo Quality Homes of Woodbury, Inc. v. Thuringer*, No. 07-340 (JNE/JJG), 2007 WL 1425490, at *8 n.5 (D. Minn. May 11, 2007) (discussing the distinction). Either way, however, Olympus's argument is without merit:  As discussed above, the contract was initially valid because it was supported by consideration, and there was no later failure of consideration that rendered it unenforceable.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Defendants' motion to dismiss [Docket No. 5] is GRANTED.

2.      Plaintiff's complaint [Docket No. 1-2] is DISMISSED WITH PREJUDICE AND

ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 30, 2012                          s/Patrick J. Schiltz_____
                                                Patrick J. Schiltz
                                                United States District Judge